FLORENCE T. NAKAKUNI, United States Attorney
District of Hawaii
EDRIC CHING, Assistant United States Attorney
United States Attorney's Office
300 Ala Moana Boulevard, Room 6-100
Honolulu, Hawaii 96850
Telephone: (808) 541-2850 / Facsimile: (808) 541-3752
JOHN C. CRUDEN, Acting Assistant Attorney General
United States Department of Justice
Environment & Natural Resources Division
K. JACK HAUGRUD, Chief
WILLIAM J. SHAPIRO, Trial Attorney (Co. Bar No. 30929)
501 I Street, Suite 9-700
Sacramento, CA 95814
Telephone: (916) 930-2207 / Facsimile: (916) 930-2210
william.shapiro@usdoj.gov

**UNITED STATES DISTRICT COURT**
**DISTRICT OF HAWAI'I**

| | |
|---|---|
| MALAMA MAKUA, a Hawai'i Nonprofit corporation, | Case No. CV-09-00369 SOM LEK |
| Plaintiff, | **Defendants' Memorandum in Support of Motion to Dismiss** |
| v. | Judge Susan Oki Mollway |
| ROBERT M. GATES, Secretary of Defense; and PETE GEREN, Secretary of the United States Department of the Army, | |
| Defendants. | |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

In this action, Plaintiff alleges that Defendants violated two settlement agreements, which the Court entered in Malama Makua v. Gates, et al., Civ. No. 00-00813 SOM LEK (D. Haw.) (hereinafter "Earlier Litigation"). The Earlier Litigation involved Plaintiff's allegations that Defendants violated the National Environmental Policy Act, 42 U.S.C. §§ 4321, et seq., in connection with Defendants' planned resumption of live-fire military training at Makua Military Reservation ("MMR"). On October 4, 2001, the parties filed a Settlement Agreement and Stipulated Order ("2001 Settlement Agreement"). On January 8, 2007, the parties entered into a Joint Stipulation Re: Partial Settlement of Plaintiff's Motion to Enforce the October 4, 2001 Settlement Agreement and Stipulated Order ("2007 Settlement Agreement").

Relevant to Plaintiff's complaint, the Settlement Agreements required Defendants to prepare, and release for public review and comment, an archaeological survey of part of the MMR and a study of marine resources near MMR. Defendants fully complied with these duties. In 2007, Defendants prepared, and released for public review, the "2007 Archaeological Subsurface Survey Within the Company Combined Arms Assault Course (CCAAC) Circumscribed by the South Firebreak Road" ("2007 Archaeological Survey"), as well as a 2007 Marine Resources Study. In 2009, Defendants prepared and released for public review a revised 2009 Marine Resources Study ("2009 Marine

Resources Study"). As the Settlement Agreements required, Defendants incorporated the studies into a final Environmental Impact Statement ("EIS"), which the Army issued on June 5, 2009.

Plaintiff admits that Defendants prepared the two studies, Compl. ¶ 37 (Archaeological Survey), id. ¶¶ 42-43 (Marine Resources Study), but disagrees with the methodology Defendants used. The Settlement Agreements do not require Defendants to use any particular methodology in preparing these studies, and Plaintiff's disagreement with the methodologies used in preparing the two studies cannot form the basis for a claimed violation of the Settlement Agreements. As discussed in more detail below, the Court should dismiss Plaintiff's claim that Defendants breached the Settlement Agreements for failure to state a claim upon which relief can be granted, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Because we base our arguments on Plaintiff's complaint and the documents discussed therein, the Court may consider these arguments pursuant to Rule 12(b)(6).

# TABLE OF CONTENTS


**TABLE OF AUTHORITIES** ... iv

**I. APPLICABLE LEGAL STANDARD** ... 1

**II. FACTUAL BACKGROUND** ... 2

- **A. The 2001 and 2007 Settlement Agreements** ... 2
- **B. The 2007 Archaeological Survey Report** ... 4
- **C. The 2009 Marine Resources Study** ... 9

**III. PROCEDURAL BACKGROUND** ... 13

**IV. GENERAL PRINCIPLES OF CONTRACT INTERPRETATION** ... 14

**V. ARGUMENT** ... 16

- **A. Defendants Completed an Archaeological Survey, as Required by the Settlement Agreements** ... 16
- **B. Defendants Completed a Marine Resources Study, as Required by the Settlement Agreements** ... 22
- **C. Defendants Sought Public Input on the Two Studies, as Required by the Settlement Agreements** ... 26
- **D. Defendants Incorporated the Two Studies into the Final EIS, as Required by the Settlement Agreements** ... 28

**VI. CONCLUSION** ... 29

# TABLE OF AUTHORITIES

## CASES


Bell Atl. Corp. v. Twombly,
550 U.S. 544 (2007) .......... 1

Boyle v. United Technologies Corp.,
487 U.S. 500 (1988) .......... 14

Branch v. Tennell,
14 F.3d 449 (9th Cir. 1994) .......... 2

Fed'n of Afr. Am. Contractors v. City of Oakland,
96 F.3d 1204 (9th Cir. 1996) .......... 1

Funeral Fin. Sys. v. United States,
234 F.3d 1015 (7th Cir. 2000) .......... 15

Grun v. Pneumo Abex Corp.,
163 F.3d 411 (7th Cir. 1998) .......... 15

Klamath Water Users Protective Ass'n v. Patterson,
204 F.3d 1206 (9th Cir. 1999) .......... 16

Makua v. Rumsfeld,
163 F. Supp. 2d 1202 (D. Hawaii 2001) .......... 2

Morris County Trust for Historic Pres. v. Pierce,
714 F.2d 271 (3rd Cir. 1983) .......... 6

Pilliard v. Meyer,
689 F. Supp. 979 (E.D. Mo. 1988) .......... 22, 25

Sanford Carr Dev. Corp. v. Unity House, Inc.,
111 Hawaii 286, 141 P.3d 459 (Haw. 2006) .......... 14, 22

Santa Clara v. Watkins,
984 F.2d 1008 (9th Cir. 1993) .......... 16

Saratoga Harness Racing v. Veneglia,
897 F. Supp. 38 (N.D.N.Y. 1995) ....................21, 25

Schroeder v. United States,
569 F.3d 956 (9th Cir. 2009)....................15

Sprewell v. Golden State Warriors,
266 F.3d 979 (9th Cir. 2001)....................1

Supermail Cargo, Inc. v. United States,
68 F.3d 1204 (9th Cir. 1995)....................1

United States v. Asarco, Inc.,
430 F.3d 972 (9th Cir. 2005)....................15

United States v. Ritchie,
342 F.3d 903 (9th Cir. 2003)....................2

United States v. Winstar,
518 U.S. 839 (1996) ....................16

Westlands Water Dist. v. United States,
337 F.3d 1092 (9th Cir. 2003)....................14

**Statutes**

16 U.S.C. § 470f ....................6

**Regulations**

32 C.F.R. § 800.3(c)(4)....................6

# I. APPLICABLE LEGAL STANDARDS

When evaluating a Rule 12(b)(6) motion to dismiss, the Court must accept as true all factual allegations in the complaint, and construe all allegations of material fact in the light most favorable to the nonmoving party. Fed'n of Afr. Am. Contractors v. City of Oakland, 96 F.3d 1204, 1207 (9th Cir. 1996). When it appears beyond doubt that a plaintiff cannot prove any set of facts that would entitle him to relief, the Court should grant a motion to dismiss. Supermail Cargo, Inc. v. United States, 68 F.3d 1204, 1207 (9th Cir. 1995). While a complaint "does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (internal citation and quotations omitted). The nonmovant may not defeat a motion to dismiss by relying on conclusory allegations of law, unwarranted deductions of fact, or unreasonable inferences. Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001).

A Court must generally limit its review of a Rule 12(b)(6) motion to the contents of the complaint, and convert the motion to one for summary judgment if it considers matters outside the pleadings. See id. at 988. Despite this, a court may "consider certain materials – documents attached to the complaint, documents incorporated by reference in the complaint, or matters of judicial notice – without

converting the motion to dismiss into a motion for summary judgment." United States v. Ritchie, 342 F.3d 903, 908 (9th Cir. 2003). In the context of a Rule 12(b)(6) motion to dismiss, the Court may consider documents that plaintiff identifies in its complaint if neither party questions the documents' authenticity. See Branch v. Tennell, 14 F.3d 449, 453-54 (9th Cir. 1994).

## II. FACTUAL BACKGROUND

### A. The 2001 and 2007 Settlement Agreements

On December 20, 2000, Plaintiff filed a lawsuit alleging that Defendants' failure to prepare an EIS for resumption of live-fire training activities at MMR violated NEPA. See Malama Makua v. Gates, et al., Civ. No. 00-00813 SOM LEK (D. Haw.) (hereinafter "Earlier Litigation"). On July 16, 2001, the Court granted Plaintiff's motion for a preliminary injunction, pending the Court's determination of whether the Army had to prepare an EIS. See Makua v. Rumsfeld, 163 F. Supp. 2d 1202 (D. Hawaii 2001).

On October 4, 2001, the parties signed the 2001 Settlement Agreement, in which Defendants agreed to prepare an EIS to analyze the proposed action. Defs.' Ex. 1. The 2001 Settlement Agreement provided that Defendants would prepare certain studies "[a]s part of the preparation of the EIS for military training activities at MMR. . . ." Id. ¶ 6. First, the 2001 Settlement Agreement provided that Defendants would assess whether there existed a "potential contamination of

soil, surface water, and ground water, and of potential impacts on air quality, associated with the proposed training activities at MMR." Id. ¶ 6(a). The agreement provided that "[i]f the studies reveal the likelihood that such contamination is occurring or has occurred, defendants shall undertake additional studies of these resources (e.g., testing of fish, limu and other marine resources on which area residents rely for subsistence; testing of muliwai for contamination)." Id.[1] If these studies "reveal[ed] the potential for off-site soil, air, ground water or surface water contamination," Defendants agreed to "undertake a long-term program to monitor such contamination." Id. ¶ 7. Second, the 2001 Settlement Agreement provided that Defendants would complete "surface and subsurface archaeological surveys of all areas within the CCAAC training area circumscribed by the south firebreak road. . . ." Id. ¶ 6(c).

On January 13, 2006, Plaintiff filed a motion to enforce the 2001 Settlement Agreement. On January 5, 2007, the parties entered into the 2007 Settlement Agreement to settle the matter. Defs.' Ex. 2. The 2007 Settlement Agreement provided that Defendants would complete "one or more studies to determine whether fish, limu, shellfish, and other marine resources near Makua Beach and in the muliwai on which area residents rely for subsistence are contaminated by

[1] "Muliwai" are "[b]rackish water pools near the mouths of streams created by seasonal barriers of sand or sediment. They are generally considered to be estuarine wetlands." Defs.' Ex. 3 at 10-13.

substances associated with the proposed training activities at MMR." Id. ¶ 6. The agreement required Defendants to test the marine resources for certain itemized substances, and "evaluate the potential that activities at MMR have contributed or will contribute to any such contamination and whether the proposed training activities at MMR pose a human health risk to area residents that rely on marine resources for subsistence." Id. The agreement also noted that Defendants "have completed the field work they believe is necessary to complete the [marine resource] studies. . . ." Id. ¶ 7. The 2007 Settlement Agreement also repeated Defendants' commitment to complete, "as part of the preparation of the [EIS] . . . surface and subsurface archaeological surveys of all areas within the [CCAAC] circumscribed by the south firebreak road, except that the area within the firebreak road identified as containing improved conventional munitions ('ICMs') on the map attached hereto as Exhibit '1' shall be surveyed only if the Headquarters . . . grants the appropriate waiver. . . ." Id. ¶ 1.

**B. The 2007 Archaeological Survey Report**

The Army conducted seven cultural resource surveys at MMR between 1977 and 2007. See Defs.' Ex. 3 at 3-317 to -318. Among these surveys was a 1995 surface survey of the entire CCAAC training area circumscribed by the south firebreak road. See id. at 3-318 (describing the 1995 survey report prepared by Eble' et al.). In November 2005, the Army developed a plan to conduct subsurface

surveys of the CCAAC training area. See Defs.' Ex. 6 at App. G-9(A) (Letter from Director of Public Works Alan Goo to Chairman and State Historic Preservation Officer). The Army determined a uniform subsurface survey of the CCAAC was impracticable: "this level of survey would take approximately 11 years to complete, estimating 10 units completed a day in a five day week with a crew of four." See id.; see also id. at App. G-9 at 3. The Army also determined that a uniform subsurface survey of the CCAAC "would be tremendously intrusive and destructive to intact cultural deposits." See id. at App. G-9(A).

The Army had previously completed subsurface surveys in several locations at MMR where surface features were present, some of which "yielded traditional Hawaiian artifacts and deposit." See id. at App. G-9 at 2. Because the Army had already surface surveyed the entire CCAAC area, and subsurface surveyed portions of the CCAAC, the Army designed the subsurface survey to focus on those portions of the CCAAC without "surface indications of archaeological remains. . . ." See id. at App. G-9(A) at 1; id. at App. G-9 at 2 (explaining the Army's decision in further detail). The Army designed the subsurface survey to "test the strength of the correlation [between the existence of surface and subsurface archaeological features] by excavating in areas without surface archaeological remains to see whether intact subsurface cultural features or deposits . . . could be commonly found without the presence of surface features." See id. at App. G-9 at

2.

Before implementing the plan, the Army described the survey design in detail, including maps of the particular locations to be tested. See id. at App. G-9(A) at Enclosure 2. In addition to providing the survey plan to Hawaii's SHPO, the Army transmitted copies of the proposed survey to interested individuals and groups, including Plaintiff. See id. at App. G-9(A).[2] Only SHPO commented on the Army's methodology used for the 2007 survey report, and it concurred with Defendants' proposed methodology. See Defs.' Ex. 8 at App. M at 2.

Between November 2005 and December 2006, Army archaeologists conducted the subsurface survey of the CCAAC training area. See Defs.' Ex. 6 at App. G-9 at 6.[3] The archaeologists first placed a grid over three locations within the CCAAC, designated as Areas 1, 2, and 3 for purposes of the report. See id. The surveyors assigned each grid point a number, then randomly selected plot points. See id. The surveyors entered each selected plot point into a Global Positioning System ("GPS") device to ensure accurate probe locations in the field.

[2] The purpose of the November 17, 2005 letter was to consult with SHPO, and other interested parties, pursuant to Section 106 of the National Historic Preservation Act, 16 U.S.C. § 470f. Section 106 requires that federal agencies consider the effects of a proposed undertaking on historical property before approving funding. In accordance with the Section 106 implementing regulations, 32 C.F.R. § 800.3(c)(4), if SHPO does not respond within 30 days of the date of the request for review, the federal agency may proceed with the undertaking. See Morris County Trust for Historic Pres. v. Pierce, 714 F.2d 271, 280 (3rd Cir. 1983).

[3] In May 2006, the Army requested a waiver from Headquarters Department of the Army ("HQDA") to allow access into the area identified as containing ICMs. The ICM area contains a large number of unstable munitions, creating a dangerous condition for surveyors. On January 10, 2007, the Deputy Assistant Secretary of the Army for Environment, Safety, and Occupational Health denied the waiver, citing the unacceptable risk posed by the munitions.

See id. The sampling plan anticipated "a minimum of 350 shovel test probes distributed throughout the survey area based on terrain, amount of former ground disturbance and site probability. . . ." See id. at App. G-9(A). The Army conducted stratified systematic sampling in additional locations within the CCAAC (designated as "Alternative Area 2" in the report). With stratified systematic sampling, a surveyor places a grid over the study area, and collects samples from probe locations set a fixed distance apart (5 meters here). See id. at App. G-9 at 6.

Archaeologists attempted 550 shovel probes within the CCAAC training area, 200 more than originally planned. See id. at App. G-9 at i. Surveyors rejected 73 of the shovel probes for a variety of reasons, see id. at App. G-9 at 7-8, and, of the remaining 477 probes, "only two demonstrated a potential for yielding intact cultural deposit. All other probes were sterile." See id. at App. G-9 at i; id. at App. G-9 at 8. Plaintiff observed the field work, and did not object to the field work as Defendants conducted the surveys. See id. at App. G-9 at 2.

In January 2007, the archaeologists finalized the 2007 Archaeological Survey Report. See id. at App. G-9. The report explained that the "project's objective was to determine a presence or absence of intact cultural deposit within the survey area where no surface features are contemporarily discernible. . . ." Id. at App. G-9 at i; id. at App. G-9 at 2. The report found a strong correlation between surface and subsurface archaeological features – if no surface features

exist, subsurface features will not likely be found. See id. at App. G-9 at 33.

The Army released the 2007 Archaeological Survey Report for 60 days of public review and comments, from February 2, 2007, to April 3, 2007, together with the draft EIS. See Defs.' Ex. 4 at App. B at 3. Defendants extended the review period an additional sixteen days, to April 19, 2007, to accommodate Plaintiff's review. See id. Several individuals, including Plaintiff's counsel and an Archaeologist hired by Plaintiff (Dr. Thomas Dye), commented on the report. See Defs.' Ex. 8 at App. M. On September 22, 2008, the Army published a revised draft EIS as a supplemental draft, and again sought public comments. See Defs.' Ex. 4 at App. B at 3; see Defs.' Ex. 9 at App. N.

On June 5, 2009, the Army issued its final EIS, which included a copy of the 2007 Archaeological Survey Report, a discussion of its conclusions, and responses to comments on the study. See Defs.' Ex. 3 at ch. 3.10 (EIS's discussion of 2007 Archaeological Survey Report); Defs.' Ex. 6 at App. G-9 (report); Defs.' Ex. 8 at App. M (response to comments on the report); Defs.' Ex. 9 at App. N (comments and responses on supplemental draft EIS); Defs.' Ex. 7 at App. K (comments and responses on draft EIS). The final EIS noted "[t]he areas [of traditional religious and cultural importance] that could be directly affected by the proposed training at MMR have been surveyed, and the identified sites are being protected." Defs.' Ex. 3 at 3-308. "Taken in conjunction with all of the previous archaeological studies,

the report provides sufficient information about the affected environment to allow a decision-maker to make conclusions about the proposed action." Id. at 3-319. The final EIS also noted that the Army has taken steps to protect cultural resources from damage during training exercises, including changing locations of training target objectives and implementing other site protection measures to ensure that no training occurs at archaeological sites. See id. at 3-333.

**C. The 2009 Marine Resources Study**

The Army, its contractors, and other federal agencies have conducted several field investigations of hydrologic and marine resources at MMR, including a 1994 study; the 2001 Makua Supplemental EA; mulawai sampling conducted by the United States EPA in 1999; muliwai sampling conducted by Tetra Tech in 2003; hydrogeologic investigations performed by the United States Army Corps of Engineers between 2002 and 2004; a February 2, 2007 Marine Resources Study evaluating contamination in fish and limu; and the 2009 Marine Resources Study, evaluating contamination in shellfish. See Defs.' Ex. 5 at App. G-8 at 1-4.

In December 2005, Tetra Tech issued a draft sampling and analysis plan ("SAP"), which set forth the scope of work and methods for the planned field sampling and risk assessment study. See id. at App. G-8 at 1-7. Based on comments from the public to the draft SAP, Tetra Tech modified the final SAP to include additional analytes, and published the final SAP in January 2007. See id.

As required by the 2007 Settlement Agreement, Defendants designed the marine resources study to:

> evaluate whether fish, shellfish, limu (marine algae), and other marine resources near Makua Beach or muliwai (estuaries or stream mouths), which area residents rely on for subsistence, are contaminated by substances associated with proposed training at Makua; to evaluate if activities at MMR have contributed to or will contribute to contamination detected in the fish, shellfish, and limu; and to evaluate whether the proposed training activities pose a health risk to area residents who rely on marine resources for subsistence.

Id. at App. G-8 at 1-6.

To accomplish these goals, "Tetra Tech conducted a sampling program to provide data to evaluate the incremental risks to human health from eating fish and shellfish collected from the muliwai downstream of MMR and in the nearshore waters and limu collected in nearshore waters." Id. at App. G-8 at 2-1. Tetra Tech collected fish and limu samples in August 2006, and shellfish samples in September and October 2008. See id. Tetra Tech selected collection sites "that could link compounds originating at MMR to marine resources in the Makua muliwai and nearshore waters." Id.

Tetra Tech identified species of interest "through discussions with regional commercial fishermen, local recreational fishermen, area divers and spear fishermen, and local residents from the Waianae coast." Id. at App. G-8 at 2-6. These discussions revealed that "local fishermen are typically opportunists who consume most of the fish they are able to catch and are not selective of species."

Id. Tetra Tech undertook a substantial effort "to select and collect marine resources that were representative of and readily available in the" mulawai and nearshores adjacent to MMR and in the background sites. Id.. The "fish, shellfish, and limu samples that were available in sufficient quantities and collected for this study were considered to be representative of the marine resources available at Makua." Id. at App. G-8 at ES-2. Once collected, Tetra Tech tested the samples for six analyte groups and 43 compounds, including all of the substances required by the 2007 Settlement Agreement. See id. at App. G-8 at 3-1. In all, Tetra Tech analyzed twenty-six fish samples, 12 shellfish samples, and four limu samples for the full suite of compounds, and three partial shellfish samples for explosives and metals only due to the samples' low weight. See id.

The Army released a draft 2007 Marine Resources Study for public review and comments, including a public meeting held on February 24, 2007. See id. at App. G-8(F) at 1. Based on comments on the draft study, Defendants revised the marine resources study, which it finalized in 2009. The Army released the final 2009 Marine Resources Study for a second 60-day public review and comment period, including a public meeting held on February 11, 2009. See Defs.' Ex. 4 at App. B at 5; see also Defs.' Ex. 5 at G-8(F) at 1.

The study describes fully the methodology, implementation, analyses and results. See id. at App. G-8 at 3-1 to 3-19. The study showed that "[f]ish,

shellfish, limu, [and the report assumes that other marine resources] near Makua Beach and in the muliwai, on which area residents rely for subsistence, are contaminated by substances that are known to be associated with the proposed training at Makua." Id. at App. G-8 at 6-7 (parenthetical in original). The report noted that the compounds analyzed "are not unique to military training and are found at both Makua and background sites. . . ." Id. The report concluded that "the low levels of most substances detected during these investigations support the position that if 60 years of live-fire training has not resulted in significant detectable levels of most substances in the area, then future live-fire activities at MMR would be expected to be likewise insignificant." Id. at App. G-8 at 6-8.

The 2009 Marine Resources Study also included a Human Health Risk Assessment, which evaluated the "absolute" risk of consuming marine resources at Makua as well as the incremental risks to both subsistence fishermen and recreational fisherman resulting from environmental conditions near Makua compared to risks resulting from environmental conditions at background locations. Id. at App. G-8 at 4-1 to 4-48. The risk assessment complies with guidelines developed by the EPA and Hawaii's Department of Health. See id. at App. G-8 at 4-1. Based on all the evidence, the report concluded that although future activities at MMR could add to existing contamination in marine resources, "it is not likely that future activities at MMR alone would contribute substances to

the marine environment at a level sufficient to cause a human health risk." Id. at App. G-8 at 6-9. The study also discussed the distinct possibility that certain contaminants arise from a variety of sources unrelated to activities on MMR. See id. at App. G-8 at 4-41 at 4-43. Furthermore, the study noted that the data related to marine resources collected from the mulawai almost certainly overstated human health risks because fishermen would not rely on the muliwai for all of their fishing. See id. at App. G-8 at 4-43 to 4-44; id. at App. G-8 at 6-4.

The final EIS included a copy of the 2009 Marine Resources Study, and a discussion of its conclusions. See Defs.' Ex. 3 at ch. 3.7.2 (EIS's discussion of the report and detailed responses to critiques to that study); id. at 3-201 to -202 (discussion of report in regards to MMR's biological resources); id. at ch. 4.9 (discussion of report in regards to Environmental Impacts of the proposed action); id. at ch. 5.0 (discussion of report in regards to Cumulative Impacts); Defs.' Ex. 5 at App. G-8 (report). In addition, the final EIS included the public comments and the Army's response to those comments. See Defs.' Ex. 5 at App. G-8(F).

## III. PROCEDURAL BACKGROUND

The parties agreed that the Court would retain jurisdiction to enforce the terms of the Settlement Agreements. Defs.' Ex. 1 ¶ 15(a); Defs.' Ex. 2 ¶ 17. Since signing the 2001 Settlement Agreement, the parties have "returned to court several times with various disputes, sometimes requiring a court ruling, sometimes

resolving matters by stipulation." Am. Order Enforcing 2001 Settlement Agreement, dated April 9, 2008 (Docket No. 188 in Makua v. Gates, Case No. 00-00813) at 15. In order to impose an orderly procedure on future court activity, the Court's April 9, 2008 Amended Order requested that "any party seeking future enforcement of the 2001 Settlement Agreement consider filing an entirely new complaint, thereby commencing a new civil action." Id. at 16. Although Plaintiff brings the present action as a new complaint, Plaintiff actually seeks to remedy a perceived violation of the Settlement Agreements. Plaintiff filed its complaint on August 12, 2009. Defendants hereby file this motion in lieu of answering.

## IV. GENERAL PRINCIPLES OF CONTRACT INTERPRETATION

In order to prove a breach of contract claim, a plaintiff must establish that a contract exists, and that defendant failed to perform as required by the contract. See Sanford Carr Dev. Corp. v. Unity House, Inc., 111 Hawaii 286, 141 P.3d 459, 476 (Haw. 2006). For purposes of this motion, Defendants assume the Settlement Agreements are contracts, but dispute that Defendants failed to perform as required by those contracts.

Although the result is the same under either federal law or state law, the obligations to and rights of the United States under its contracts are "governed exclusively by federal law." Boyle v. United Technologies Corp., 487 U.S. 500, 504 (1988) (citations omitted); Westlands Water Dist. v. United States, 337 F.3d

1092, 1100 (9th Cir. 2003) ("Since the United States is a party to both contracts, federal common law controls"); see also Funeral Fin. Sys. v. United States, 234 F.3d 1015, 1018 (7th Cir. 2000) ("Interpreting the meaning of a provision in a federal government contract is a matter of federal common law, and therefore, we must apply federal common law rules of contract interpretation").

A basic tenet of contract construction holds that a court should interpret a contract to give meaning to all of its terms. See Restatement (Second) Contracts, § 203(a). Federal courts interpret language "'in an ordinary and popular sense as would a person of average intelligence and experience.'" Grun v. Pneumo Abex Corp., 163 F.3d 411, 420 (7th Cir. 1998) (internal citation omitted); see also State Farm Fire & Cas. Co., 90 Haw. at 324, 978 P.2d at 762 (same). "In interpreting contractual terms under federal common law, [the Court should] give effect to the parties' intentions as ascertained from the terms themselves." Schroeder v. United States, 569 F.3d 956, 961 (9th Cir. 2009); see also State Farm Fire & Cas. Co., 90 Haw. at 324, 978 P.2d at 762 ("The court should look no further than the four corners of the document to determine whether an ambiguity exists."). If, and only if, a contract is ambiguous may a court look to extrinsic evidence to interpret a contract's terms. State Farm Fire & Cas. Co., 90 Haw. at 324, 978 P.2d at 762; see also United States v. Asarco, Inc., 430 F.3d 972, 980 (9th Cir. 2005).

"The fact that the parties dispute a contract's meaning does not establish that

the contract is ambiguous; it is only ambiguous if reasonable people could find its terms susceptible to more than one interpretation." Klamath Water Users Protective Ass'n v. Patterson, 204 F.3d 1206, 1210 (9th Cir. 1999) (internal citations omitted); Santa Clara v. Watkins, 984 F.2d 1008, 1012-13 (9th Cir. 1993). It is a canon of contract construction that implied government obligations are disfavored. See United States v. Winstar, 518 U.S. 839, 874 (1996).

## V. ARGUMENT

### A. Defendants Completed an Archaeological Survey, as Required by the Settlement Agreements

Plaintiff first argues that Defendants violated paragraph 6(c) of the 2001 Settlement Agreement and paragraph 1 of the 2007 Settlement Agreement, which required Defendants to complete surface and subsurface archaeological surveys "of all areas within the [CCAAC] circumscribed by the south firebreak road," other than the ICM area. Compl. ¶ 54 (quoting paragraph 1 of the 2007 Settlement Agreement). The Settlement Agreements did not require Defendants to use any particular surveying methodology or prescribe requirements for the substance of the archaeological report.

Although Plaintiff admits Defendants prepared the 2007 Archaeological Survey, Plaintiff argues Defendants violated the Settlement Agreements in three ways. First, Plaintiff argues Defendants failed to survey two locations in the

CCAAC: "one bordering the ICM area on the south and southwest and another to the south of sites 4543 and 4542." Id. ¶ 38. Plaintiff premises its argument that the Settlement Agreements required Defendants to collect data from every square inch of the CCAAC area on an unreasonable interpretation of the Settlement Agreements and a flawed understanding of the 2007 Archaeological Survey. The Settlement Agreement provides that Defendants will complete "surface and subsurface archaeological surveys of all areas within the" CCAAC, except the ICM area. Defs.' Ex. 2 ¶ 1. The language is unambiguous, and the only reasonable interpretation is that Defendants should prepare surface and subsurface surveys of the CCAAC – that is, the land "circumscribed by the south firebreak road." Id. ¶ 1. The 2007 Settlement Agreement required Defendants to survey the entire CCAAC, but it did not require Defendants to collect data from every square inch of the CCAAC, as Plaintiff proposes. Before designing and implementing the 2007 Archaeological Survey, the Army had completed several earlier cultural resource surveys at MMR, including a surface survey of the entire CCAAC. See Defs.' Ex. 3 at 3-317 to 3-318. The Settlement Agreements did not require Defendants to resurvey any part of the CCAAC area, and there is no reasonable argument that Defendants should have done so. Rather than replicating the existing data, Defendants designed the 2007 Archaeological Survey to utilize the existing knowledge about archaeological features known to exist within the

CCAAC area. See Defs.' Ex. 6 at App. G-9 at 2; Defs.' Ex. 8 at App. M at 3 (noting that Defendants designed the survey, in part, "on the body of archaeological knowledge regarding the area and past excavation activities, including a high level of soil disturbance").

To accomplish the subsurface survey, Defendants reasonably chose four locations (designated as Areas 1, 2, 3, and Alternative Area 2) to collect data, but designed the study as a survey of the entire CCAAC area. To accomplish this goal, Defendants collected sufficient data from the four locations to "test the strength of the correlation [between surface and subsurface archaeological features] by excavating in areas without surface archaeological remains to see whether intact subsurface cultural features or deposits . . . could be commonly found without the presence of surface features." See Defs.' Ex. 6 at App. G-9 at 2. The study demonstrated that the correlation was strong – if no surface features exist, there is a strong likelihood that no subsurface features will be found. See id. at App. G-9 at 33. Defendants' decision to not collect data from the small locations south of the ICM area and south of sites 4543 and 4542 does not detract from this conclusion because the very nature of representative sampling means that surveyors do not collect data from every inch of the study area.[4] As the survey itself notes, stratified

---

[4] Although not critical to resolution of this motion, the two areas identified in Plaintiff's complaint are adjacent to the south firebreak road. Plaintiff's argument that Defendants should have collected data from these areas contradicts the position of an Archaeologist hired by Plaintiff to critique the 2007 Archaeological Survey Report,

random sampling "groups members of the population into relatively homogeneous subgroups." Id. at App. G-9 at 6. Although "no technique can guarantee a representative sample, . . . random sampling is the best means for obtaining unbiased samples." Id. Consistent with this technique, Defendants designed the survey to apply to the entire CCAAC, as required by the Settlement Agreements, and implemented the survey as designed.

The archaeological survey complied with "both the Secretary of the Interior's Standards and Guidelines for Archaeological and Historic Preservation (Identification), as well as the Department of Defense Guidelines regarding Archaeological Inventory Survey Standards and Cost-estimation Guidelines." Defs.' Ex. 8 at App. M at 2. In addition, the survey complied with the National Park Service's Guidelines for Local Surveys (Rev. 1985), which notes that in developing a survey plan, "historical research and survey work already done should be incorporated in the new project and complemented, not duplicated. . . ." Id. at App. M at 2-3. Although Defendants notified Plaintiffs in 2005 of the survey design, see Defs.' Ex. 6 at App. G-9(A), Plaintiffs never objected to the plan until after Defendants completed the survey.

---

who noted that "excavation in the vicinity of roads often yields more information about road construction than it does about archaeological sites that were present before the road was built. . . ." Defs.' Ex. 7 at App. K-98.

Collecting data from every inch of the CCAAC likely would take decades to complete, and destroy any subsurface features located within the CCAAC. Indeed, Defendants originally considered conducting a uniform subsurface survey of the CCAAC, but determined that such a survey would take 11 years to complete, and would destroy any intact cultural deposits. See id. at App. G-9 at 3; id. at App. G-9(A). Apparently, even that study would not have satisfied Plaintiff's unreasonable reading of the 2007 Settlement Agreement, since that proposal would have utilized a gridded plot design, rather than probing every inch of the CCAAC. Moreover, surveying every inch of the CCAAC would require Defendants to dig below all known surface features – which would require Defendants to dismantle, move or destroy all known archaeological sites. In short, the unambiguous language of the Settlement Agreements does not support Plaintiff's position, and Plaintiff's position would result in an unreasonable result. The requirement that Defendants complete surveys "of all areas within the" CCAAC means exactly what it says – Defendants had to complete a survey to study the entire CCAAC. The 2007 Archaeological Survey accomplishes precisely that.

Second, Plaintiff asserts that the study was "inadequate to provide a representative sample of the designated survey area." Compl. ¶ 39. According to Plaintiff, Defendants should have "determine[d] recovery probabilities" for various subsurface features "likely to be found at Makua (e.g., imu (earthen ovens), post

holes, tools, and other artifacts)." Id. The Settlement Agreements did not require Defendants to "determine recovery probabilities," and Defendants' decision to not include such analysis cannot form the basis for a breach of contract claim.

Third, Plaintiff argues that "field work for this project was never completed" because Defendants "determined they needed 350 excavations to carry out their sampling," but rejected 73 of the shovel probes. Compl. ¶ 40. The Settlement Agreements do not require Defendants to take a certain number of shovel probes – indeed, Defendants could have satisfied their duty under the Settlement Agreements by collecting significantly less data. Moreover, Defendants based the 2007 Archaeological Survey on 477 useable probes, more than the originally-planned 350 excavations.[5]

Plaintiff negotiated a number of modifications of the terms of the 2001 Settlement Agreement, including authorization for Plaintiff to observe the surveys. See Defs.' Ex. 2 ¶ 5. In choosing to negotiate some aspects of the survey process and not others, Plaintiff conceded to Defendants' discretion in the conduct of the surveys. See Saratoga Harness Racing v. Veneglia, 897 F. Supp. 38, 42 (N.D.N.Y. 1995) (consent expressly or through silence to conditions in agreement). Further, Plaintiff cannot maintain a strategic silence on Defendants' implementation of the

[5] In addition, it bears noting that although Defendants anticipated taking 350 excavations, it did not determine that the survey would require 350 useable shovel probes. It is commonplace in archaeological surveys that some probes will be unusable for some reason.

survey and then later assert a violation. See Pilliard v. Meyer, 689 F. Supp. 979, 982 (E.D. Mo. 1988) (no entitlement to strategic silence on meaning of costs to obtain fees).

In summary, Defendants prepared the archaeological study required by the Settlement Agreements. Plaintiff's disagreement with the substance of that report does not state a claim for a breach of contract because the Settlement Agreements do not establish the substantive requirements asserted in Plaintiff's Complaint. See Sanford Carr Dev. Corp., 141 P.3d at 476 (requiring a plaintiff pursuing a breach of contract claim to show that defendant failed to perform a duty established by the contract). The Court should dismiss Plaintiff's First Cause of Action pursuant to Rule 12(b)(6).

### B. Defendants Completed a Marine Resources Study, as Required by the Settlement Agreements

Plaintiff next argues that Defendants violated paragraph 6(a) of the 2001 Settlement Agreement and paragraph 6 of the 2007 Settlement Agreement, which required Defendants to complete a study "to determine whether fish, limu, shellfish, and other marine resources near Makua Beach and in the muliwai on which area residents rely for subsistence are contaminated by substances associated with the proposed training activities at MMR" and to evaluate "the potential that activities at MMR have contributed or will contribute to any such

contamination and whether the proposed training activities at MMR pose a human health risk to area residents [who] rely on marine resources for subsistence." Compl. ¶ 56 (quoting paragraph 6 of the 2007 Settlement Agreement). The Settlement Agreements did not require Defendants to use any particular testing methodology or prescribe requirements for the substance of the marine resources report.

Although Plaintiff concedes that Defendants prepared the 2009 Marine Resources Study, id. ¶ 42, Plaintiff argues Defendants violated the Settlement Agreements in three ways. First, Plaintiff argues that Defendants should have tested additional types of marine resources because the 2007 Settlement Agreement "requires that marine resources other than shellfish, fish, and limu be studied and tested." Id. ¶ 44 (emphasis added). The unambiguous language of the Settlement Agreements does not support Plaintiff's argument. The Settlement Agreements did not require Defendants to study or test any particular kind of marine resource, much less marine resources other than shellfish, fish and limu. The 2001 Settlement Agreement, for example, required Defendants to undertake studies of "these resources" – that is, "marine resources or wildlife on or near Makua Beach." Defs.' Ex. 1 ¶ 6(a). In a parenthetical, the 2001 Settlement Agreement noted one way Defendants could satisfy the requirement: "e.g., testing of fish, limu and other marine resources on which area residents rely for

subsistence; testing of the muliwai for contamination." Id. ¶ 6(a). The parties unambiguously offered the test in the parenthetical as an exemplar, not a requirement.

The 2007 Settlement Agreement is no different, and any test designed to determine whether "fish, limu, shellfish and other marine resources" were contaminated fully satisfied the agreement. Defendants satisfied this requirement by undertaking a "substantial effort . . . to select and collect marine resources that were representative of and readily available in the" mulawai and nearshores adjacent to MMR and in the background sites. Defs.' Ex. 5 at App. G-8 at 2-6. The "fish, shellfish, and limu samples that were available in sufficient quantities and collected for this study were considered to be representative of the marine resources available at Makua." Id. at App. G-8 at ES-2; id. at App. G-8 at 6-7.

Second, Plaintiff argues that Defendants should have tested edible limu. Compl. ¶ 45. The Settlement Agreements did not require Defendants to test limu at all, much less any particular species of limu. The EIS explains that Defendants collected and tested the available limu, and reasonably concluded that the sampled limu was representative of the limu available in the nearshore adjacent to MMR. Defs.' Ex. 8 at App. G-8(F) at 133.

Third, Plaintiff disagrees with the design and implementation of the 2009 Marine Resources Study, arguing that Defendants should have conducted other

analyses and studies. See Compl. ¶ 46. The Settlement Agreements did not require Defendants to utilize any particular methodology, and did not require any of the proposed tests. Plaintiff's critiques cannot form the basis for a breach of contract claim.

In agreeing to the 2007 Settlement Agreement, Plaintiff negotiated a number of modifications to the parties' earlier agreement, including specific inclusion of a list of contaminants to be tested. See Defs.' Ex. 2 ¶ 6. In choosing to negotiate some aspects of the marine resource study and not others, Plaintiff assented to Defendants' discretion in conducting the study. See Saratoga Harness Racing, 897 F. Supp. at 42. Moreover, Plaintiff cannot maintain a strategic silence on Defendants' implementation of the study and then later assert a violation. See Pilliard, 689 F. Supp. at 982.

In summary, Defendants prepared the marine resource study required by the Settlement Agreements. Plaintiff's disagreement with the substance of that report does not state a claim for a breach of contract because the Settlement Agreements do not establish the substantive requirements Plaintiff asserts. The Court should dismiss, therefore, Plaintiff's Second Cause of Action pursuant to Rule 12(b)(6).

**C. Defendants Sought Public Input on the Two Studies, as Required by the Settlement Agreements**

Plaintiff next argues that Defendants violated paragraphs 11 and 12 of the 2007 Settlement Agreement, which required Defendants to release the archaeological survey and marine resource study for public review and comment, including at least one public meeting to receive comments on the studies. See Compl. ¶ 58 (Third Claim for Relief). Plaintiff premises this Third Claim for Relief on the flawed argument that Defendants did not prepare studies that satisfied the parties' Settlement Agreements. The Court should reject this argument because Defendants did prepare the two studies.

As the 2007 Settlement Agreement required, Defendants released the studies for public review and comment, including at least one public meeting to receive comments on the studies. The Army released the 2007 Archaeological Survey Report for 60 days of public review and comment from February 2, 2007, to April 3, 2007. See Defs.' Ex. 4 at App. B at 3. The Army transmitted a final copy of the report to Plaintiff's counsel, who, along with Plaintiff's hired Archaeologist, had an opportunity to review the study and transmit comments. After modifying the draft EIS in response to public comments, the Army published a supplemental draft EIS, and again sought public comments. See id. The final EIS includes comments on the 2007 Archaeological Survey, and responses to those comments. See Defs.'

Ex. 8 at App. M (Subsurface Archaeological Survey Comments); Defs.' Ex. 7 at App. K (comments and responses to Draft EIS); Defs.' Ex. 9 at App. N (comments and responses to Supplemental Draft EIS).

Defendants also released the draft Marine Resources Study for public review and comment for 60 days of public review and comment from February 2, 2007, to April 3, 2007, including a public comment meeting on February 24, 2007. See Defs.' Ex. 4 at App. B at 3. Defendants released the final study for a second 60-day period of review. See id. at App. B at 5; Defs.' Ex. 5 at App. G-8(F) at 1. The Army transmitted copies of the draft and final report to Plaintiff's counsel, who, along with Plaintiff's hired expert, had an opportunity to review the studies and transmit comments. The final EIS includes comments on the 2009 Marine Resources Study, and the 2007 draft study, and responses to those comments. See id. at App. G-8(F) (responses to comments on the draft and final marine resources studies); Defs.' Ex. 7 at App. K (comments and responses to Draft EIS); Defs.' Ex. 9 at App. N (comments and responses to Supplemental Draft EIS).

Consequently, Defendants did not breach paragraph 11 or 12 of the 2007 Settlement Agreement.

### D. Defendants Incorporated the Two Studies into the Final EIS, as Required by the Settlement Agreements

Finally, Plaintiff argues that Defendants violated paragraph 13 of the 2007 Settlement Agreement, which required Defendants to "incorporate in the final EIS an analysis of the results of the archaeological surveys conducted pursuant to paragraph 1 and the marine resources studies conducted pursuant to paragraph 6." Compl. ¶ 36 (quoting paragraph 13 of the 2007 Settlement Agreement). Plaintiff premises this Fourth Claim for Relief upon a flawed argument that Defendants did not prepare studies that satisfied the parties' Settlement Agreements. The Court should reject this argument because Defendants did prepare the two studies.

Defendants incorporated in the final EIS a discussion and analysis of the results of the 2007 Archaeology Survey. The final EIS included a copy of the 2007 Archaeological Survey Report, a discussion of its conclusions, and comments on the report. See Defs.' Ex. 3 at 3-307 to -320 and 3-331 to -335 (EIS's discussion of 2008 Archaeological Survey Report); Defs.' Ex. 6 at App. G-9 (report); Defs.' Ex. 8 at App. M (response to comments on the report). In addition, Defendants incorporated in the final EIS a discussion and analysis of the results of the 2009 Marine Resources Study. The final EIS included a copy of the 2009 Marine Resources Study, a discussion of its conclusions, and comments on the report. See Defs.' Ex. 3 at ch. 3.7.2 (EIS's discussion of the report and detailed

responses to critiques to that study); id. at ch. 3.9 (discussion of report in regards to MMR's biological resources); id. at 4-130 to -132 (discussion of report in regards to Environmental Impacts of the proposed action); id. at ch. 5.0 (discussion of report in regards to Cumulative Impacts); Defs.' Ex. 5 at App. G-8 (report); id. at App. G-8(F) (comments on marine resources studies). Consequently, Defendants did not breach paragraph 13 of the 2007 Settlement Agreement.

## VI. CONCLUSION

Plaintiff bases its claims on its disagreement with the design of Defendants' 2007 Archaeological Survey and 2009 Marine Resources Study. For the reasons discussed above, the Settlement Agreements did not require Defendants to follow any particular methodology in designing or implementing the two studies. Plaintiff's critique of those studies, therefore, cannot form the basis for a breach of contract claim. The Court should conclude Defendants fully complied with the Settlement Agreements, and dismiss Plaintiff's complaint for failure to state a claim upon which relief can be granted.

Respectfully submitted this 5th day of October, 2009,

JOHN C. CRUDEN, Acting Assistant Attorney General
United States Department of Justice
Environment & Natural Resources Division
K. JACK HAUGRUD, Chief

_/s/ William J. Shapiro_______________

WILLIAM J. SHAPIRO, Trial Attorney
Natural Resources Section
501 I Street, Suite 9-700
Sacramento, CA 95814
Telephone: (916) 930-2207 / Facsimile: (916) 930-2210
william.shapiro@usdoj.gov
Attorney for Federal Defendants

Of Counsel
Robert M. Lewis
Senior Trial Attorney
U.S. Army Environmental Law Division
Arlington, VA 22203