IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

MĀLAMA MĀKUA, a Hawai`i non- )   CIVIL NO. 09-00369 SOM/LEK
profit corporation,           )
                              )
          Plaintiff,          )   ORDER GRANTING IN PART AND
                              )   DENYING IN PART CROSS-MOTIONS
     vs.                      )   FOR SUMMARY JUDGMENT
                              )
ROBERT GATES, Secretary of    )
Defense; and JOHN McHUGH,     )
Secretary of the United       )
States Department of the      )
Army,                         )
                              )
          Defendants.         )
_____ )

ORDER GRANTING IN PART AND DENYING IN PART
CROSS-MOTIONS FOR SUMMARY JUDGMENT

I.        INTRODUCTION AND FACTUAL BACKGROUND.

          In the August 12, 2009, Complaint for Declaratory

Judgment and Injunctive Relief, Mālama Mākua asserts that, as

part of an extensive 2001 settlement agreement arising out of a

dispute as to whether Defendants ("the Army") had to prepare an

environmental impact statement ("EIS") addressing the effects of

military training with live ammunition at the Makua Military

Reservation ("MMR") in West Oahu, Hawaii, the Army agreed to

"diligently pursue completion of an EIS" for proposed military

training.  See Complaint for Declaratory Judgment and Injunctive

Relief ¶ 19, Aug. 12, 2009, ECF No. 1; Settlement Agreement and

Stipulated Order ¶ 1. Oct. 4, 2001, ECF No. 62-2.  The parties

settled the dispute in 2001 and Mālama Mākua alleges that, as

part of that settlement, the Army agreed to fill in gaps in

existing knowledge by conducting various studies.  See Complaint ¶ 21.

The 2001 settlement agreement required the Army to conduct and complete "surface and subsurface archaeological surveys of all areas within the CCAAC [Company Combined Arms Assault Course] training area circumscribed by the south firebreak road," except for areas suspected of containing Improved Conventional Munitions ("ICMs").  2001 Settlement Agreement ¶ 6(c), ECF No. 62-2.

The 2001 settlement agreement also required the Army to "Complete studies of potential contamination of soil, surface water, and ground water, and of potential impacts on air quality, associated with the proposed training activities at MMR."  2001 Settlement Agreement ¶ 6(a), ECF No. 62-2.  The studies were to evaluate whether there was the potential of contamination to "the muliwai [brackish water pools near mouths of streams], or any marine resource or wildlife on or near Mākua Beach."  Id.  If the studies revealed a likelihood of contamination, the Army was to "undertake additional studies of the[] resources (e.g., testing of fish, limu and other marine resources on which area residents rely for subsistence; testing of the muliwai for contamination)."  Id.

A previous attempt by Mālama Mākua to enforce the 2001 settlement agreement led to a 2007 settlement agreement in which

the Army similarly agreed to conduct "surface and subsurface archaeological surveys of all areas within the Company Combined-Arms Assault Course circumscribed by the south firebreak road," except for areas suspected of containing ICMs.  Joint Stipulation Re: Partial Settlement of Plaintiff's Motion to Enforce the October 4, 2001 Settlement Agreement and Stipulated Order ¶ 1, Jan. 8, 2007, ECF No. 62-3.  The 2007 settlement also obligated the Army to conduct "one or more studies to determine whether fish, limu, shellfish, and other marine resources near Mākua Beach and in the muliwai on which area residents rely for subsistence are contaminated by substances associated with the proposed training activities at MMR."  Id. ¶ 6.

Given this court's November 18, 2009, order, two claims remain for adjudication.  In the First Claim for Relief, Mālama Mākua asserts that the Army violated the 2001 and 2007 settlement agreements by failing to properly conduct and complete subsurface archaeological surveys of all areas within the CCAAC.  The Complaint does not claim that the Army violated the settlement agreements by failing to conduct surface archaeological surveys.  See Complaint ¶¶ 11, 25, 29, 38-41, 53-54.  In the Second Claim for Relief, Mālama Mākua asserts that the Army violated the 2001 and 2007 settlement agreements by failing to properly conduct marine resource contamination studies.  Id. ¶¶ 31, 33, 44-48, 55-56.

Both parties have filed motions for summary judgment on these two remaining claims. With respect to the subsurface survey claim, summary judgment is granted in part to each party. To the extent the Army failed to conduct any subsurface survey of Areas A to F, the Army violated its agreement to survey "all areas" of the CCAAC. However, to the extent Mālama Mākua seeks a better subsurface survey of Areas 1 to 3, summary judgment is granted in favor of the Army, as the settlement agreements do not require the Army to conduct any particular type of survey and the Army's survey of those areas is sufficiently meaningful to satisfy its obligations.

With respect to Mālama Mākua's claim that the Army violated its marine resource survey obligations, summary judgment is granted in favor of the Army with respect to the 2001 settlement agreement. Summary judgment is also granted in favor of the Army on Mālama Mākua's claim that the general procedures used in the marine resource survey were deficient. However, summary judgment is granted in favor of Mālama Mākua on its claim that the survey was not meaningful in two respects. On the remaining issues raised by the motions, summary judgment is denied to both parties, given the numerous questions of fact surrounding the Army's obligation to test marine resources on which area residents rely for subsistence.

II.        SUMMARY JUDGMENT STANDARD.

        Summary judgment shall be granted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  One of the principal purposes of summary judgment is to identify and dispose of factually unsupported claims and defenses.  Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986).  Accordingly, "[o]nly admissible evidence may be considered in deciding a motion for summary judgment." Miller v. Glenn Miller Prods., Inc., 454 F.3d 975, 988 (9th Cir. 2006).  Summary judgment must be granted against a party that fails to demonstrate facts to establish what will be an essential element at trial.  See Celotex, 477 U.S. at 323.  A moving party has both the initial burden of production and the ultimate burden of persuasion on a motion for summary judgment. Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1102 (9th Cir. 2000).  The burden initially falls on the moving party to identify for the court "those portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact." T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987) (citing Celotex Corp., 477 U.S. at 323); accord Miller, 454 F.3d at 987.

"A fact is material if it could affect the outcome of the suit under the governing substantive law." <u>Miller</u>, 454 F.3d at 987.

When the moving party fails to carry its initial burden of production, "the nonmoving party has no obligation to produce anything."  In such a case, the nonmoving party may defeat the motion for summary judgment without producing anything.  <u>Nissan Fire</u>, 210 F.3d at 1102-03.  On the other hand, when the moving party meets its initial burden on a summary judgment motion, the "burden then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial." <u>Miller</u>, 454 F.3d at 987.  This means that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,</u> 475 U.S. 574, 586 (1986) (footnote omitted).  The nonmoving party may not rely on the mere allegations in the pleadings and instead "must set forth specific facts showing that there is a genuine issue for trial." <u>Porter v. Cal. Dep't of Corr.</u>, 419 F.3d 885, 891 (9th Cir. 2005) (quoting <u>Anderson v. Liberty Lobby, Inc.,</u> 477 U.S. 242, 256 (1986)).  "A genuine dispute arises if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>California v. Campbell</u>, 319 F.3d 1161, 1166 (9th Cir. 2003); <u>Addisu v. Fred Meyer, Inc.,</u> 198 F.3d 1130, 1134 (9th Cir. 2000) ("There must be

enough doubt for a 'reasonable trier of fact' to find for plaintiffs in order to defeat the summary judgment motion.").

On a summary judgment motion, "the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor."  Miller, 454 F.3d at 988 (quotations and brackets omitted).

III.   ANALYSIS.

Mālama Mākua seeks summary judgment on the First and Second Claims for Relief, arguing that the Army violated paragraph 6(c) of the 2001 settlement agreement and paragraph 1 of the 2007 settlement agreement by failing to properly complete a subsurface archaeological survey.  Mālama Mākua also seeks summary judgment on its claim that the Army failed to comply with paragraph 6(a) of the 2001 settlement agreement and paragraph 6 of the 2007 settlement agreement, which required the Army to complete a marine resource contamination study.  The Army similarly seeks summary judgment, arguing that it complied with its obligations under those paragraphs.

In reviewing actions for compliance with the settlement agreements, this court applies normal principles of contract law. This court need not decide whether to apply Hawaii or federal common law rules of contract construction, as both are the same in this case.  See O'Niel v. Bunge Corp., 365 F.3d 820, 822 (9th Cir. 2004) ("construction and enforcement of settlement

agreements are governed by principles of local law which apply to interpretation of contracts generally"); Funeral Fin. Sys. v. United States, 234 F.3d 1015, 1018 (7th Cir, 2000) ("Interpreting the meaning of a provision in a federal government contract is a matter of federal common law, and therefore, we must apply federal common law rules of contract interpretation"); Boskoff v. Yano, 217 F. Supp. 2d 1077, 1085 (D. Haw. 2001) (applying Hawaii contract law to construe a settlement agreement).  Under Hawaii law, contract terms are "interpreted according to their plain, ordinary and accepted use in common speech, unless the contract indicates a different meaning."  Amfac, Inc. v. Waikiki Beachcomber Inv. Co., 74 Haw. 85, 108, 839 P.2d 10, 24 (1992). Similarly, federal common law follows general principals of contract construction.  See Ellinger v. United States, 470 F.3d 1325, 1336 (11th Cir. 2006).  Under federal common law, courts interpret contractual language "in an ordinary and popular sense as would a person of average intelligence and experience." Funeral Fin. Sys., 234 F.3d at 1018.

A.   The First Claim for Relief.

The 2001 settlement agreement required the Army to conduct and complete "subsurface archaeological surveys of all areas within the CCAAC [Company Combined Arms Assault Course] training area circumscribed by the south firebreak road," except for areas suspected of containing Improved Conventional Munitions

("ICMs").  2001 Settlement Agreement ¶ 6(c), ECF No. 62-2
(emphasis added).  The 2007 settlement agreement similarly
required the Army to conduct "subsurface archaeological surveys
of all areas within the Company Combined-Arms Assault Course
circumscribed by the south firebreak road," except for areas
suspected of containing ICMs.  2007 Settlement Agreement ¶ 1, ECF
No. 62-3 (emphasis added).  If ICMs were suspected in an area,
the settlement agreements required the Army to attempt to get a
waiver to survey the area.  No subsurface survey was required if
an Army Explosive Ordnance Safety Officer determined that
conditions made such a survey too dangerous.  See 2001 Settlement
Agreement ¶ 6(c); 2007 Settlement Agreement ¶ 1.

        The Army argues that it complied with the subsurface
survey requirements when it issued its Subsurface Archaeological
Survey Report, ECF Nos. 58-17 to 58-21, and Subsurface
Archaeological Survey Comments, ECF No. 58-23.  Mālama Mākua
argues that these documents do not demonstrate that the Army
satisfied its burden of conducting subsurface surveys of "all
areas" in the CCAAC that did not contain ICMs.  The court agrees
in part with each party's position.

        The Army admitted in its Final EIS that it failed to
survey all areas of the CCAAC.  Page 3-319 of the Final EIS, ECF
Nos. 58-6 to 58-8, states that the archaeological "survey looked
at the entire area inside the south firebreak road of MMR, with

9

limited exceptions," including areas "that already had archaeological sites and therefore had already been sampled," areas where the possibility of ICMs made it too dangerous to conduct the surveys, and "a small area at the southeast edge of firebreak road."  Id.

There is no dispute that the "small area at the southeast edge of firebreak road," identified as Area A, was not surveyed by the Army.  See Ex. 1 to Deposition of Laurie Lucking, Ph.D, Apr. 7. 2010, ECF 62-7 (outline of Area A handwritten on the picture of the CCAAC[1]).  The Final EIS states that Area A was not surveyed "primarily because it was marked as off-limits due to the presence of ICMs."  Final EIS at 3-319.  But it is unclear that ICMs were indeed suspected in Area A.  See Exhibits 33 and 34, ECF Nos. 92 and 93 (indicating that Area A was not in an area containing known ICMs).  As explained below, this court need not decide whether ICMs exist in Area A to determine that the Army breached its obligations under the settlement agreements with respect to Area A.

The court sent the parties a list of questions before the hearing on this matter.  See Inclinations, ECF No. 89.  At the hearing, in response to one of those questions, the Army admitted that it did not attempt to obtain the appropriate

---

[1]On Exhibit 1 to Lucking's Deposition, Area A is depicted one to two inches to the left of the Exhibit 1 sticker and is somewhat level to the top of that sticker.

waivers to conduct a subsurface survey in Area A.  The Army therefore does not demonstrate on the present record that it made good-faith efforts to secure a waiver to allow a subsurface survey in Area A, as required by paragraph 6(c) of the 2001 settlement agreement and paragraph 1 of the 2007 settlement agreement.  The Army also did not present admissible evidence by an Army Explosive Ordnance Safety Officer that conducting a subsurface survey of Area A would have been too dangerous.  Under these circumstances, the Army has not justified its failure to conduct a subsurface survey of Area A.  This court is not ruling that the Army is required to actually conduct a subsurface survey of Area A.  If safety concerns truly existed with respect to Area A, the Army would not be required to conduct a subsurface survey of it so long as the Army followed the requirements of paragraph 6(c) of the 2001 settlement agreement and paragraph 1 of the 2007 settlement agreement.

Laurie Lucking, the cultural resources section chief for the U.S. Army Garrison Hawaii, indicates that the Army's survey results show that, in areas where no surface cultural sites exist, 99% of the time no subsurface cultural sites exist either.  See Deposition of Laurie Lucking, Ph.D, at 7 and 45, Apr. 7. 2010, ECF Nos. 58-26 and 62-7.  Lucking further says that, as a result of its survey, the Army determined that there was a "very strong relationship" between the existence of surface

cultural sites and the presence of subsurface cultural sites. Id. at 83.  Lucking says that the Army did not survey five areas, Areas B to F, because the Army assumed that there was a high likelihood of subsurface archaeological sites in those areas, given the areas' proximity to other known sites.  See id. at 102-04.  Because the Army did not survey Areas B to F, Mālama Mākua is entitled to summary judgment that the Army failed to survey "all areas" as required by the settlement agreements.  The Army was not justified in merely assuming that subsurface sites existed in Areas B to F given the settlement agreements' requirement that the Army actually conduct subsurface surveys of all areas.  The court is not holding that the Army was required to survey every inch of the CCAAC.  What the court is doing here is holding the Army to its agreement to conduct a survey of "all areas" of the CCAAC.

To the extent Mālama Mākua argues that the Army's subsurface surveys failed to meet professionally acceptable standards or failed to determine "recovery probabilities," the Army is entitled to summary judgment.  That is, to the extent Mālama Mākua seeks a better subsurface survey of Areas 1 to 3, summary judgment is granted in favor of the Army.

Neither settlement agreement describes the exact subsurface archaeological survey required.  The Army was certainly required to do a good-faith subsurface archaeological

survey to comply with the agreements.  While Mālama Mākua may take issue with how the Army conducted the subsurface survey, Mālama Mākua does not demonstrate that the Army breached the settlement agreements by conducting the subsurface survey as it did.  For example, Mālama Mākua challenges the number of random samples taken by the Army, and argues that the Army needed to gather information about the subsurface archaeological sites to make the survey procedurally valid.  These specific survey elements were not, however, explicitly required by the agreements.  Mālama Mākua has the burden of proving a breach, and a reference to how the survey could have been improved is not tantamount to such proof.

Mālama Mākua's argument that a greater number or a different density of shovel probes was necessary is unavailing. There is no dispute that the Army used a "stratified random sample" analysis in conducting its survey, which the Army characterizes as "a perfectly acceptable method of testing for the presence or absence of cultural deposits." See Lucking Depo. at 20, 35, ECF No. 62-7.  The Army planned to include 350 shovel test probes as part of the "stratified random sample" analysis. See, e.g., Letter from Alan K. L. Goo to Peter Young, undated, ECF No. 62-8; Lucking Depo. at 24-25, ECF No. 62-7.  There appears to be no dispute that this "stratified random sample" analysis actually consisted of 277 random shovel test probes and

13

200 other shovel test probes.  <u>See</u> Final EIS at 3-318 to 3-319.
Mālama Mākua fails to show that these shovel test probes were
insufficient to satisfy the Army's contractual obligation to
conduct a subsurface archaeological survey in good faith.  Mālama
Mākua's desire for the Army to conduct its survey in a different
manner does not transform the settlement agreements.  It cannot
be said based on the present record that the Army breached its
obligations to conduct subsurface surveys of Areas 1, 2, and 3.

B.  <u>Second Claim for Relief.</u>

In the Complaint's Second Claim for Relief, Mālama
Mākua asserts that the Army failed to comply with paragraph 6(a)
of the 2001 settlement agreement and paragraph 6 of the 2007
settlement agreement, which pertain to a marine resource survey.
The 2007 settlement agreement required the Army to complete

> studies to determine whether fish, limu,
> shellfish, and other marine resources near
> Mākua Beach and in the muliwai on which area
> residents rely for subsistence are
> contaminated by substances associated with
> the proposed training activities at MMR . . .
> [and to evaluate] the potential that
> activities at MMR have contributed or will
> contribute to any such contamination and
> whether the proposed training activities at
> MMR pose a human health risk to area
> residents [who] rely on marine resources for
> subsistence.

2007 Settlement Agreement ¶ 6, ECF No. 62-3.  The 2001 Settlement
Agreement simply stated that, if contamination "studies reveal
the likelihood that such contamination is occurring or has

14

occurred, defendants shall undertake additional studies of these resources (e.g., testing of fish, limu and other marine resources on which area residents rely for subsistence; testing of the muliwai for contamination)." 2001 Settlement Agreement ¶ 6(a), ECF No. 62-2.

Mālama Mākua seeks a ruling that the Army breached the settlement agreements by 1) not testing "other marine resources . . . on which area residents rely for subsistence"; 2) failing to test edible limu; 3) failing to test at "background locations" so that a contamination comparison could be made between identical species at those locations and near Mākua beach; 4) using inappropriate "background locations"; and 5) not identifying the specific type of arsenic found in the species tested. The Army seeks a contrary ruling that it complied with its marine resource survey obligations.

To the extent Mālama Mākua argues that general procedures used by the Army violated the settlement agreements, summary judgment is granted to the Army because the settlement agreements did not call for any specific kind of survey to have been conducted. However, to the extent Mālama Mākua claims that the Army breached its obligations by not testing background contamination of limu and not determining whether the arsenic detected was harmful to human health, summary judgment is granted to Mālama Mākua. As explained in detail below, the Army is

15

entitled to summary judgment on the marine resource survey claim arising out of the 2001 settlement agreement, but questions of fact preclude summary judgment on remaining claims arising out of the 2007 marine resource survey.

> 1.    The Army is Entitled to Summary Judgment With Respect to Mālama Mākua's Challenge to the General Procedures Used by the Army in Conducting the Marine Resource Survey.

Mālama Mākua takes issue with the general procedures the Army used in conducting its marine resource survey. Specifically, Mālama Mākua argues that the Army violated the agreements by not taking underwater samples or samples at night. The settlement agreements neither required the Army to test every species nor take samples at certain times.  Instead, the agreements only required "studies to determine whether fish, limu, shellfish, and other marine resources near Mākua Beach and in the muliwai on which area residents rely for subsistence are contaminated."  The Army's marine resource study of fish, limu, and shellfish cannot be said as a matter of law to have violated the agreements.  That is, to the extent Mālama Mākua contends that a different manner or time of testing should have been employed, the Army is entitled to summary judgment.

The settlement agreements did not require any particular marine resource survey; they required only that such a survey be done.  Mālama Mākua's identification of potential ways

16

a marine resource survey would have been better does not demonstrate a breach of the agreements.

Mālama Mākua also complains about the marine resource study's use of the Nanakuli muliwai and Sandy Beach as comparisons for "background" contamination.  Mālama Mākua says that the Nanakuli muliwai was inappropriately selected because there may be runoff from the Navy's Lualuelei ammunition magazine that contaminated it.  See Declaration of J.E. Jack Rensel, Ph.D, ¶ 9, May 25, 2010, ECF No. 61-14.  Mālama Mākua says the selection of Sandy Beach as another background location was inappropriate because a wastewater treatment plant may be polluting the area.  See id. ¶ 15.  The Army's study indicates that it specifically chose background locations that were not pristine because there may be many potential sources of contamination.  The study stated, "As long as the background sites selected are representative of ambient conditions for the general Mākua vicinity and have not received contamination from the MMR, they are considered acceptable."  See Marine Resource Study at 2-2.  Mālama Mākua demonstrates no breach of the settlement agreements based on the Army's selection of the Nanakuli muliwai and Sandy Beach as background locations, as the agreements do not require any specific location to be used to set a baseline for contamination.

The court is also not persuaded by Mālama Mākua's argument that the Army violated the settlement agreement by failing to collect samples of identical species at Mākua Beach and the two background locations--Nanakuli muliwai and Sandy Beach.  Although the study might have been better if, for example, a goatfish from Mākua Beach had been compared to goatfish from the Nanakuli muliwai and Sandy Beach, the study was generally able to compare levels of contamination at the various locations.  The Army's inability to definitively explain the differences in metal concentrations because different species of fish were tested at each site does not necessarily render the tests meaningless.  Mālama Mākua was certainly entitled to have the Army conduct tests, but the Army met its contractual obligations if it conducted meaningful, even if not optimal, tests.  Except as set forth below, the tests the Army conducted were sufficiently meaningful to satisfy the Army's good-faith obligations under the settlement agreements.

2.   The Marine Resource Survey Was Deficient in Two Ways.

Mālama Mākua identified two ways in which the marine resource survey conducted by the Army was not sufficiently meaningful.  Mālama Mākua argues that the Army violated the settlement agreements by failing to test limu at other locations.  This failure meant no comparison could demonstrate whether the limu at Mākua Beach was contaminated by the Army's activities at

MMR.  See Marine Resource Study at 4-33 to 4-35 ("since no background samples were collected, it is not possible to determine whether the arsenic levels detected in limu at Mākua Beach are elevated over background.  The levels detected at Mākua Beach may well be naturally occurring.").

Mālama Mākua notes that the Army's study merely concluded that everything in the area was contaminated and potentially dangerous to human health.  This court agrees that a mere conclusion is not a meaningful study.  The 2007 settlement agreement required the Army to determine whether the marine resources were contaminated by the Army's activities at MMR and to evaluate the potential that the Army's activities at MMR had contributed or would contribute to such contamination or pose a human health risk.  Because the Army did not determine the baseline contamination for limu in general in Hawaii, it did not comply with its contractual obligation to conduct a meaningful survey.  A test of limu at Makua and an assumption of a health threat is not a meaningful survey that evaluates the potential that the Army's activities at MMR were contributing to contamination or posing a human health risk to area residents who rely on marine resources for subsistence.

Similarly, because the Army did not determine whether the arsenic detected in the limu was of the highly toxic or inorganic form, the Army did not comply with its contractual

obligation to assess the human health risks associated with its activities at MMR.  The court is unpersuaded by the Army's suggestion that, because the arsenic levels in the limu were consistent with naturally occurring levels in all waters of Hawaii, the arsenic found in the limu at Mākua Beach was not caused by the Army's activities at MMR.  See Marine Resource Study, App. F. at 5.  There is no dispute that the Army did not test the naturally occurring levels of arsenic in Hawaii limu. Id. ("Since arsenic has never been measured in any of the seaweeds present in Hawaii previously, it cannot be determined at this point whether the arsenic concentrations measured are naturally occurring or elevated.").  The Army provides no basis on which to say whether it caused the arsenic to be present in the limu tested.

> 3.    Questions of Fact Preclude Summary Judgement
>       as to Claims that the Army Breached the 2007
>       Settlement Agreement by Failing to Test
>       Marine Resources on Which Area Residents Rely
>       for Subsistence.

Pointing to its Marine Resources Study Field Sampling Results and Risk Assessment, the Army contends that it complied with its obligations to test "other marine resources . . . on which area residents rely for subsistence."  See ECF No. 58-7 to 58-16.  There is no dispute that the Army tested twenty-six fish, twelve shellfish, and four limu.  The species tested included striped mullet, Hawaiian flagtail, tilapia complex, medaka,

Picasso triggerfish, blackspot triggerfish, manybar goatfish, Christmas wrasse, blackspot sergeant, Samoan crab, rock crab, Kona crab, Hawaiian prawn, and helmut urchin.  Id. at ES-2.  The Army concluded that fish, shellfish, and limu near Mākua Beach were "contaminated by substances that are known to be associated with the proposed training at Mākua."  Id. at ES-12.  The study determined that there were potential chemical migration pathways from MMR to the muliwai and nearshore areas at Mākua.  Id.  The study also concluded that there were a number of substances found in the samples that might pose a potential health risk.  Id.

     The study indicates that other marine resources in the muliwai and near Mākua Beach were not tested but assumes that, had they been tested, they would have also shown contamination. The study reasons that the fish, shellfish, and limu tested were representative of other marine resources in the area and assumes that those resources would also be contaminated because the tests of the fish, shellfish, and limu demonstrated contamination.  Id.

     According to the study, the Army tested a representative range of species, identified "through discussions with regional commercial fishermen, local recreational fishermen, area divers and spear fishermen, and local residents from the Waianae coast."  Id. at 2-6.  The marine resources study states that area residents were likely to harvest fish and shellfish from Mākua Beach and the muliwai area.  See id. at 2-6 and 4-5.

21

To the extent Mālama Mākua seeks a determination that the Army breached the settlement agreements by failing to test other marine resources that area residents rely on for subsistence, summary judgment is granted in favor of the Army in part and denied with respect to both parties in part. As this court previously determined, the 2001 settlement agreement did not require the testing of other marine resources relied on for subsistence. Instead, that language was used as an example of types of additional studies that were to be conducted if other studies revealed a likelihood of contamination. See 2001 Settlement Agreement ¶ 6(a). Accordingly, the Army satisfied its obligations under paragraph 6(a) of the 2001 settlement agreement. The court notes that, even if the 2001 agreement could be read as requiring the testing of "fish, limu, and other marine resources" relied on for subsistence, it is undisputed that the Army tested shellfish, and that, as shellfish is a "marine resource," the Army satisfied its obligations if area residents rely on the tested species for subsistence.

With respect to the 2007 settlement agreement, questions of fact preclude summary judgment in favor of either party. The 2007 settlement agreement required the Army to conduct "studies to determine whether fish, limu, shellfish, and other marine resources near Mākua Beach and in the muliwai on which area residents rely for subsistence are contaminated by

22

substances associated with the proposed training activities at MMR . . . ." 2007 Settlement Agreement ¶ 6. Questions of fact exist as to what fish, limu, shellfish, and other marine resources are relied on by area residents for subsistence and whether the Army did enough to try and identify these resources.

Neither party sufficiently explains what "rely on for subsistence" means.  The study indicates that the Army identified species consumed by area residents "through discussions with regional commercial fishermen, local recreational fishermen, area divers and spear fishermen, and local residents from the Waianae coast." Id. at 2-6.  Because the Army did not submit evidence explaining those discussions, a question of fact exists as to whether the Army sufficiently attempted to identify fish, shellfish, limu, and other marine resources on which area residents rely for subsistence, or whether the Army identified just species occasionally caught or occasionally eaten.  It is not at all clear to the court that consumption once a decade, for instance, qualifies as "relying for subsistence" on an item.

For its part, Mālama Mākua identifies other marine resources that were not tested (e.g., octopus and sea cucumber), but mere identification does not demonstrate a breach of the agreement.  Mālama Mākua fails to demonstrate that area residents rely on these resources for subsistence, as opposed to merely eating them once in a while when they are available.

Mālama Mākua's argument that the Army breached the
settlement agreement by only testing inedible limu fails for the
same reason.  Vince Kana`i Dodge, a long-time resident of
Wai`anae indicates that edible limu exists at Mākua Beach and
that he often eats this limu.  <u>See</u> Declaration of Vince Kana`i
Dodge ¶¶ 2-3, May 25, 2010, ECF No. 61-1.  Mālama Mākua argues
that the Army's failure to test edible limu violates the
requirement that limu relied on for subsistence be tested.
However, there is no evidence in the record that people of the
Wai`anae Coast rely on edible limu for subsistence.  The evidence
is only that an individual likes to eat it.  <u>See, e.g.</u>, Dodge
Decl. (indicating that he collects and eats limu from Mākua
beach, but not saying that he "relies" on that limu for
subsistence).

IV.      <u>CONCLUSION.</u>

As detailed above, this court grants the cross motions
for summary judgment in part and denies them in part, leaving for
further adjudication claims that the Army violated the 2007

settlement agreement with respect to the marine resource survey by not testing or insufficiently testing marine resources that area residents rely on for subsistence.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, October 27, 2010.



_/s/ Susan Oki Mollway_
Susan Oki Mollway
United States District Judge

Mālama Mākua v. Gates, et al.; Civil No. 09-00369 SOM/LEK; ORDER GRANTING IN PART AND DENYING IN PART CROSS-MOTIONS FOR SUMMARY JUDGMENT